**DEMPSTER BROTHERS, INC., Plaintiff-Appellant,**

v.

**BUFFALO METAL CONTAINER CORPORATION, Defendant-Appellee.**

No. 24, Docket 29673.

United States Court of Appeals Second Circuit.

Argued Sept. 30, 1965.

Decided Nov. 3, 1965.

J. Preston Swecker, of Burns, Doane, Benedict, Swecker & Mathis, Washington, D. C. (Conrad Christel, of Christel & Bean, Buffalo, N. Y., Charles D. Snepp of Anderson & Snepp, Knoxville, Tenn., and James P. Burns, of Burns, Doane, Benedict, Swecker & Mathis, Washington, D. C., on the brief), for plaintiff-appellant.

Michael Beilewech, Jr., of Magavern, Magavern, Lowe & Beilewech, Buffalo, N. Y., for defendant-appellee.

Before FRIENDLY and KAUFMAN, Circuit Judges and HERLANDS, District Judge.*

KAUFMAN, Circuit Judge:

From the District Court's determination that its patent for a front end loader garbage and pick-up device was invalid, the plaintiff Dempster Brothers, Inc. ("Dempster") appeals. The District Court accurately and succinctly described the patent in suit as a device providing for

"a front end type fork and arm loader which is mounted on a cab over engine truck chassis bearing a body adapted for holding refuse. The loading device permits a driver to engage a specially designed refuse container, dump the container, and return and disengage the container without leaving the truck cab. It utilizes two rigid, inverted 'U' or gooseneck configuration arms which are attached at their one end to the outer extremities of a rotable, hydraulically actuated torque tube mounted on the truck chassis immediately behind the cab. Thus mounted, in their down position, the arms extend up, across the top, and down in front on either side of the cab. At the frontmost downwardly extending tips, the arms are joined by another rotatable hydraulically actuated torque tube to which two forks are attached; each fork being affixed near the outer extremity of the torque tube, perpendicular to the tube and in a parallel relation to one another.

"On each of two sides of the refuse container, designed for use with this mechanism, is a type of sleeve affixed to the container, parallel with its base and designed for engagement by the aforedescribed forks. To engage the container the truck approaches the container with its forks in line with and directed into the container sleeves; the forks engage the sleeves, and the arms are then raised, arcing the container (which is kept relatively level by rotation of the torque tube to which the forks are affixed) up and over the refuse body. By rotating the forks the container is dumped, the procedure is then reversed, and the truck proceeds to another container."

Dempster maintains that the defendant Buffalo Metal Container Corporation ("Buffalo") infringed claims 5, 6, 8, 9, 14, 15, 16, 18, 19 and 20 of the Patent issued to Dempster on August 18, 1959. Buffalo conceded below that if the patent were valid, it was guilty of infringement. Accordingly, the sole issue tried was the validity of Dempster's patent. Judge Henderson found that claims 6, 8, 9 and 20, relating primarily to the torque, fork, and container sleeve portion of the loader, were invalid on the basis of the prior art. Claims 5, 14, 15, 16, 18 and 19, relating in the main to the gooseneck configuration of the arms, were found to be an "obvious" improvement over the prior art.[1]

We affirm.

In 1953, in keeping with an industry-wide movement to find a replacement for obsolescent rear end loaders, Dempster began to manufacture front end loader refuse equipment. Its 1953 model (the "Holmes-Owen," or "H-O" loader) proved unsatisfactory in a number of respects. The witness Shea, Dempster's Vice-President, explained that the H-O loader's arms were not bent to clear the doors of the cab. As a result, the driver could be pinned inside the cab. Moreover, the arms were "jointed": when they had been raised to a certain point,

---

* Of the Southern District of New York, sitting by designation.

1. "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103.

they bent at the joint and *threw* the contents of the refuse containers into the body of the truck.[2] One of the crucial difficulties with this operation, Judge Henderson indicated, was that it created a "dead spot" during the container's arc from the ground to dumping position. In the event the operator failed to reverse the controls at precisely the correct moment, the operation could prove dangerous.

The "Clearance Arm," or "C–A" loader, the subject of the disputed patent, was developed by Dempster to cure these and other deficiencies. The principal advantages of this new model were: (1) the gooseneck arrangement of the arms over the cab provided added safety for the driver, making it impossible for him to be "pinned" inside the cab at any stage of the dumping procedure; (2) the rigid arms gave the operator of the truck continuous control throughout the dumping procedure; (3) the hydraulically actuated fork and arms allowed the container to remain level during most of the arc, thereby lessening the risk of spilling the contents; (4) the fork-sleeve attachment at the top of the sides of the container, rather than at the bottom, shortened the arc of the container and facilitated keeping the container level, thus diminishing the risk of accidents. The C–A model represented a significant improvement over the H–O. Indeed, we do not understand Buffalo to contend that the C–A loader would not have been patentable, had there been no other developments in the field subsequent to 1953.

## I.

Judge Henderson found, as we have indicated, that the gooseneck configuration of the arms over the cab of the C–A loader, although an important refinement providing a final solution to the problems posed by arms which did not clear the cab doors at all stages of the dumping process, was an obvious modification of the rigid arms utilized by other manufacturers in 1954 and 1955. Although it is not clear to us which prior art the District Judge relied on, we have no reason to reject Dempster's assertion that foremost among the prior art was a loader produced by the Western Body & Hoist Company ("Western") and sold to the P. D. Hamlin Disposal Company in 1954. This unit, photographs of which were identified at trial by the witness Livesley, President of Western, employed arms bent in a "double S" shape, passing over the wheels but under the cab doors when the arms were in the "down" position. In response to a question by the Court, Dempster's expert witness Hughes admitted that if presented with the Western loader and asked to solve the problem of clearing the doors at all stages of the dumping process, "I would be rather dumb if I didn't consider it [the gooseneck configuration later devised by Dempster] as a possibility."

We are mindful that in determining what was "obvious," infallible hindsight is much more common than precarious foresight. Judge Learned Hand explained this premise:

"The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not, 'obvious' is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it. There are indeed some sign posts: e. g.

2. A jointed arm is referred to in the trade as a "broken arm," whereas an arm which operates as a single unit is called a "straight arm" regardless of whether or not it has a bent configuration such as the Dempster gooseneck shape. To avoid confusion, we will employ the terminology "jointed arms" and "rigid arms," and further differentiate between rigid arms whose configurations are "straight" or "bent."

how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant?" Reiner v. I. Leon Co., 285 F.2d 501, 503–504 (2d Cir. 1960), cert. denied, 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961); see Lorenz v. F. W. Woolworth Co., 305 F.2d 102, 104–105 (2d Cir. 1962).

While it is true that Dempster's solution was immediately heralded by its competitors as *the* answer, commercial success of a device, although certainly a relevant factor, does not by itself establish the validity of a patent. Lorenz v. F. W. Woolworth Co., supra. Here, the need had existed for a comparatively short time; several witnesses testified that they had never seen a front end loader prior to the early 1950's. During this period, several manufacturers experimented with various arm configurations: the H–O broken arm; the rigid, straight arm; the Western "double S" arm. Although the progression was not lineal, each manufacturer sought to improve on his competitor's latest adaptations. We agree that the C–A loader's gooseneck arms, the last step in the evolution, was "obvious" from the prior art.

## II.

Dempster argues vigorously that its patent claims relating to the torque, fork, and container sleeve segment of the C–A loader were not anticipated by the prior art. In invalidating these claims, the District Judge relied on a rejected patent application filed by R. L. Aldredge in 1955, two vehicles manufactured by S. Vincen Bowles and sold, respectively, to Lawndale Disposal Company and Antelope Rubbish Company ("Bowles loaders"), a unit manufactured by Cook Bros. and sold to James E. Barnes ("Barnes loader"), and, finally, loaders produced by Western having features comparable to those of the C–A loader.

■■ Dempster urges that there was insufficient proof of the existence of the prior art demonstrated by the Barnes and Bowles loaders. While we agree with Judge Henderson's observation that additional proof of prior art would have made the judicial task simpler, we are convinced the evidence substantiates the District Court's conclusions. It is true that the testimony concerning these loaders contained some inconsistences, and documentation closer in time would have made the defendant's case stronger. But, viewing the record as a whole, we cannot say that the District Court's "complete satisfaction" with Buffalo's proof of prior art was clearly erroneous. In so holding, we are not unmindful that to the extent the evidence consisted of depositions and documents, "we are in as good a position as the trial court to examine it * * *." Devex Corp. v. General Motors Corp., 321 F.2d 234, 239 (7th Cir. 1963), cert. denied, 375 U.S. 971, 84 S.Ct. 490, 11 L.Ed.2d 418 (1964); see Orvis v. Higgins, 180 F.2d 537, 539 (2d Cir.), cert. denied, 340 U.S. 810, 71 S.Ct. 37, 95 L. Ed. 595 (1950); cf. Iravani Mottaghi v. Barkey Importing Co., 244 F.2d 238, 248 (2d Cir.), cert. denied, 354 U.S. 939, 77 S.Ct. 1402, 1 L.Ed.2d 1538 (1957).

■■ The appellant attacks the testimony of Barnes that in January 1956 he purchased from Cook Bros. a Reo truck with a front end loading device employing rigid arms curved to fit over the wheels of the cab and under the doors (similar to the Western unit described above) and hydraulically actuated forks at the end of the arms which fitted into sleeves on the lower part of the sides of detachable containers. This testimony is insufficient, it argues, because no contemporaneous documentation was introduced, and a large manufacturer such as Cook would normally be expected to have available pictorial and schematic drawings of units which it had produced. While such documentary proof would have been preferable, there is no absolute requirement that the evidence take this form. Anderson Co. v. Trico Prod. Co.,

267 F.2d 700, 703 (2d Cir. 1959).[3] Accord, Turner Dock Transfer Co. v. Terminal Engineering Co., 94 F.2d 79, 80 (2d Cir. 1938). In any event, the record is not devoid of documentation, albeit noncontemporaneous. Barnes unequivocally identified a 1956 photograph of another Reo truck which he had purchased from Cook in April or May 1956, as substantially similar in appearance to his January 1956 purchase.[4] And, while Barnes admitted on cross-examination that the truck had been out of his possession for a period of time and the forks had been repaired, in response to questioning by the court he adhered to his earlier testimony that the photographs were reasonable representations of the truck he purchased in January 1956. The court's "complete satisfaction" with the proof of the prior art, including the Barnes loader, implies a finding that Barnes' testimony was credible, notwithstanding inconsistencies. For us to reject this assessment of credibility out of hand, would be to invade the province of the trier of fact. See Oil Tranport Corp. v. Amboy Towboats, Inc., 193 F.2d 264 (2d Cir. 1952); Orvis v. Higgins, supra; Scott v. Spanjer Bros., Inc., 298 F.2d 928 (2d Cir. 1962) (jury). See generally Hazard, After the Trial Court—The Realities of Appellate Review, in The Courts, the Public, and the Law Explosion 60 (Harry W. Jones ed. 1965).

Bowles' deposition provides additional proof of prior art. Bowles stated that in 1955 he built loaders also employing hydraulically actuated forks fitting into sleeves on detachable containers and sold them to Lawndale Disposal Co. and Antelope Rubbish Co. He too identified noncontemporaneous photographs as accurate portrayals of the relevant portions of the loaders as they existed in 1955. As we have already indicated, since credibility played little part in the trial court's assessment of this evidence, we have a wider scope of review. Nevertheless, we are disinclined to set aside the finding of fact, carefully arrived at below and supported by deposition testimony that the relevant features of the Bowles loaders existed in 1955.[5]

Finally, Dempster argues that even if the Barnes and Bowles loaders existed as depicted in the 1956 photographs on or before May 28, 1956, they did not meet the claims of the patent for the C–A loader, and therefore cannot be "the [same] invention * * * in public use * * *" within the meaning of 35 U.S.C. § 102(b). For example, it says the forks on the Barnes loader fitted into sleeves near the bottom of the container, while the forks on the C–A model picked it up near the top, providing greater stability and safety. At the very least, it is urged, the case should be remanded to the trial court for more detailed findings on the precise method of operation of the Barnes and Bowles pick-up mechanisms. Although more specific findings of fact would have been helpful on our review, a remand is unnecessary in this case. For, even if we accept arguendo Dempster's

3. We are not unaware that on rehearing, we vacated our original decision on the ground that the prior public use had not been proved by clear and convincing evidence. However, we expressly noted that not only had the evidence of prior use been entirely oral, but also that "that testimony is by no means abundant." 267 F.2d at 705.

4. Other documentary evidence of the purchase was also introduced: a conditional sales agreement for the Reo vehicle, a letter from the motor vehicle department, and a motor vehicle registration form. But, since the descriptions of the vehicle referred to in these exhibits are vague, we place little reliance on them.

5. We have carefully examined the record and noted the factors which Dempster contends reflect adversely on the proof that the Bowles loaders existed in 1955, such as the minor inconsistencies between the depositions of Bowles and Leon Mick (part owner of both Lawndale and Antelope) and Bowles' possible motivation for bias (an infringement suit by Dempster against him was settled by consent decree). We are not persuaded that these circumstances sufficed to destroy Bowles' clear testimony on direct examination so that we would be warranted in overriding the lower court's finding.

contention that its pick-up device was a substantial improvement over the prior art, we believe that its modifications were "obvious," based on the criteria already discussed in connection with the gooseneck arms.

Since we consider the prior art demonstrated by the Bowles and Barnes loaders to have been adequately proven, we find it unnecessary to consider Dempster's further contentions that the trial court misread the Aldredge patent or that the claims of its patent related to the pick-up mechanism were not met by the Western loader.

Affirmed.